## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

GLENDA G. HENDERSON,

      Plaintiff,

v.                                  CIVIL ACTION NO. 3:20-cv-00224

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Glenda G. Henderson ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 3.) By standing order entered on January 4, 2016, and filed in this case on April 2, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 14) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 15).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 36 years old at the time of her alleged disability onset date and 46 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 197.)[1]  She completed the eleventh grade. (*Id*. at 225.)  Most recently, she worked as a cook in a sandwich shop, and she has also been employed as a food line worker at a frozen food company and as a server at a fast-food restaurant. (*Id*.)  Claimant alleges that she became disabled on April 1, 2009, due to scoliosis, attention-deficit hyperactivity disorder, bipolar disorder, and depression. (*Id*. at 220, 224.)

Claimant filed her application for benefits in January 2017. (*Id*. at 197–202.)  Her claim was initially denied on February 14, 2017, and again upon reconsideration on June 28, 2017. (*Id*. at 114–18, 122–24.)  Thereafter, on July 28, 2017, Claimant filed a written request for hearing. (*Id*. at 130–32.)  An administrative hearing was held before an ALJ on January 24, 2019, in Huntington, West Virginia, with the ALJ appearing from Baltimore, Maryland. (*Id*. at 28–84.)  On February 22, 2019, the ALJ rendered an unfavorable decision. (*Id*. at 9–27.)  Claimant then sought review of the ALJ's decision by the Appeals Council on April 15, 2019. (*Id*. at 192–96.)  The Appeals Council denied Claimant's request for review on January 30, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id*. at 1–6.)

Claimant timely brought the present action on April 1, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 3.)  The

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF Nos. 12 and 13.

Commissioner filed an Answer (ECF No. 11) and a transcript of the administrative proceedings (ECF Nos. 12, 13). Claimant subsequently filed her Brief in Support of Judgment on the Pleadings (ECF No. 14), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 15). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. Treatment for Neck and Back Impairments

Claimant presented to her primary care physician monthly between January 11, 2016, and December 30, 2016, and did not report any neck or back pain or issues, and physical examinations were normal during that time. (*Id.* at 322–442.) On January 30, 2017, she reported that she was "doing well" and had no symptoms. (*Id.* at 491.) A physical examination was normal. (*Id.* at 493–95.) However, at her next appointment on March 1, 2017, she complained of "mild joint discomfort with changes in the weather." (*Id.* at 482.) A physical examination was normal. (*Id.* at 484–86.) She was directed to continue using her pain medications. (*Id.* at 486.) Claimant again reported that she was "doing well" on March 30, 2017, and her physical examination was normal that day. (*Id.* at 508, 510–12.) At her roughly monthly appointments between April 28, 2017, and September 20, 2017, she did not report any neck or back pain or issues, and physical examinations were normal. (*Id.* at 646–91.)

On May 21, 2018, Claimant presented to her primary care physician and reported "neuropathic pain," but a physical examination was normal. (*Id.* at 692, 694–96.) She

was directed to continue her medication. (*Id.* at 696.) When she returned on July 2, 2018, she reported that "she is doing fairly well" and had "no major complaints." (*Id.* at 702.) A physical examination was normal. (*Id.* at 704–06.) She also did not report any neck or back pain or issues at her July 31, August 28, November 29, and December 27, 2018 appointments, and physical examinations were normal on those days. (*Id.* at 712–31, 752–70.)

       *2. Consultative Medical Examination: Dr. Clifford Roberson, M.D.*

Claimant presented to consultative medical examiner Dr. Clifford Roberson, M.D. ("Dr. Roberson") on July 5, 2016, for an evaluation of her "chronic neck, upper and lower back pain" that she stated had lasted for "approximately five years." (Tr. at 303.) She told Dr. Roberson that her pain was not associated with any spinal injury and that her symptoms had "progressively worse[ned]" over time. (*Id.*) She reported that her neck and upper back pain was worse than her lower back pain and that her pain radiated into her extremities and caused numbness, tingling, burning, and weakness. (*Id.*) Claimant also stated that her pain "is usually aggravated by any activities" and that "Nothing seems to help the pain." (*Id.*) Still, she "denie[d] any [previous] treatment for her neck and low back." (*Id.*)

Upon physical examination, Dr. Roberson observed that Claimant "has a normal gait pattern" and was able to walk on her heels and toes and to squat. (*Id.* at 304.) He noted tenderness and pain on range of motion in Claimant's cervical spine, as well as decreased sensation in her right upper extremity, but he observed that Claimant had full range of motion. (*Id.*) He also noted tenderness, decreased sensation, and pain with range of motion in Claimant's lumbar spine, but he observed that she had full range of motion, and straight-leg-raising tests were negative bilaterally in the supine and standing

positions. (*Id.*) When examining Claimant's upper extremities, Dr. Roberson observed decreased sensation in her right hand, but she had full range of motion in her shoulders, elbows, wrists, and fingers, and she was able to pinch, grip, perform fine manipulation, and make a fist bilaterally. (*Id.*) He noted that Claimant had full range of motion in her hips, knees, and ankles without pain and no tenderness, atrophy, or joint swelling or instability in her lower extremities. (*Id.*) Dr. Roberson also stated that an x-ray of Claimant's lumbar spine imaged on the day of the consultative medical examination "showed no evidence of acute or chronic changes" and was "Unremarkable." (*Id.*; *see id.* at 312.)

Dr. Roberson diagnosed Claimant with chronic neck and low back pain and depression by history. (*Id.* at 304.) He stated, "Clinical evaluation of her neck and low back is not consistent with any objective findings that suggest any significant impairment of her neck or low back." (*Id.*)

### 3. Treatment for Mental Impairments

In December 2010, well before her SSI application was filed, Claimant was hospitalized for several weeks after being involuntarily committed to a mental health facility when her boyfriend filed a mental hygiene petition. (*Id.* at 567–89, 598–603, 608–17.)

Claimant presented to her primary care physician on March 10, 2016, for a routine appointment. (*Id.* at 416.) She reported that she was "doing well," had "less anxiety," and her "meds help." (*Id.*) A psychiatric examination was normal, and her primary care physician noted that her anxiety was "stable." (*Id.* at 420.) She returned on April 6, 2016, and he again noted that she was "doing well," and a psychiatric examination was normal. (*Id.* at 406, 410.)

Claimant presented to her primary care physician on September 30, 2016, for a routine appointment. (*Id.* at 350.) Her provider noted that she had mild anxiety, but a mental status examination was normal. (*Id.* at 350, 354.) At her next appointment on October 31, 2016, her provider instructed her to "continue [her] medications" and noted that she was "doing well." (*Id.* at 344.) A mental status examination was normal. (*Id.*)

On December 16, 2016, Claimant presented to a mental health clinic for a mental health assessment. (*Id.* at 460.) It was noted that she had previously been treated at the clinic "for many years" and had been diagnosed with attention-deficit hyperactivity disorder. (*Id.*) She related depressive and manic episodes that had been ongoing for several months. (*Id.* at 460–61.) A mental status examination was largely normal aside from tense motor behavior, anxious affect, and pressured speech. (*Id.* at 471–73.) Claimant was diagnosed with bipolar disorder with a history of psychosis. (*Id.* at 475.) She was referred for a psychiatric evaluation for medication and for therapy. (*Id.* at 470.) She had her first therapy appointment on December 21, 2016. (*Id.* at 445.) Upon mental status examination, Claimant appeared disheveled and had a cooperative manner, a stressed, anxious, and restless mood, and a broad affect. (*Id.*) The therapist observed that she was easily distracted and had moderately impaired judgment, partial insight, normal speech, and circumstantial thought processes. (*Id.*) Claimant reported visual hallucinations and delusions. (*Id.*) The therapist also noted that she "report[ed] moderate symptoms of depression" and "moderate-severe symptoms of mania" but "feels like she is 'somewhere in the middle' between a depressed episode and a manic episode." (*Id.* at 446.)

Several days later, on December 27, 2016, Claimant presented to a psychiatric evaluation for medication. (*Id.* at 450.) She related symptoms of depression, anxiety,

6

psychosis, and anger, and she rated her depression "10/10" and her anxiety "9/10" that day. (*Id.*) A mental status examination was normal aside from increased, hyperactive motor activity; heightened affect; and fair insight and judgment. (*Id.* at 451–52.) Claimant was diagnosed with moderate bipolar disorder with history of psychosis and prescribed medication. (*Id.* at 452–53.) She was given a guarded prognosis and directed to return in two weeks. (*Id.* at 453.) At her next appointment on January 3, 2017, Claimant reported that her symptoms had improved since starting medication and "that she spent Christmas with her grandson and that she enjoyed herself," but she still rated her depression "10/10" and her anxiety "8/10" that day. (*Id.* at 455.) A mental status examination was normal aside from hyperactive motor activity. (*Id.* at 456–57.) Her medication dosage was increased, and she was instructed to continue therapy and to follow up in two months. (*Id.* at 458.)

The following day, on January 4, 2017, Claimant presented to a therapy session. (*Id.* at 448.) Upon mental status examination, the therapist observed that she appeared casual with a cooperative manner and appropriate affect but "appears somewhat restless and dysphoric." (*Id.*) Claimant had fair attention and concentration, moderately impaired judgment, partial insight, normal speech, and intact thought processes. (*Id.*) She reported moderate symptoms of depression and anxiety. (*Id.* at 449.) The therapist directed her to return for another session in two weeks. (*Id.*)

On January 30, 2017, Claimant presented to her primary care provider and reported that she was "doing well" and had no symptoms. (*Id.* at 491.) He noted no abnormal psychiatric findings. (*Id.* at 495.) At her next appointment on March 1, 2017, her primary care provider wrote that her anxiety was "currently stable." (*Id.* at 486.) He again noted no abnormal psychiatric findings. (*Id.*) He remarked that her anxiety and

depression were "stable" and noted no abnormal psychiatric findings at her March 30, 2017 appointment. (*Id.* at 512.) When Claimant presented to her primary care physician again on April 28, 2017, she reported that she was "doing well" and "feels well," and her physician did not note any abnormal psychiatric findings. (*Id.* at 646, 650.)

Claimant returned to the mental health facility for medication management on May 17, 2017. (*Id.* at 551.) She reported "feeling depressed for long periods" and "increased anxiety," and she rated her depression "8/10" and her anxiety "8/10." (*Id.*) A mental status examination was normal aside from restless motor activity, pressured speech, and partial insight. (*Id.* at 552–53.) The dosage of Claimant's medication was increased, and she was prescribed an additional medication. (*Id.* at 554.) She was directed to follow up in two months and to continue receiving therapy. (*Id.*) About a week later, on May 26, 2017, Claimant presented to her primary care physician and reported that she was "doing well" and had "less anxiety." (*Id.* at 655.) Her physician did not note any abnormal psychiatric findings at that appointment or at any of her roughly monthly appointments between then and September 20, 2017. (*Id.* at 659, 668, 677, 687.) Claimant did not return to the mental health facility and was eventually discharged from treatment on February 1, 2018. (*Id.* at 556.)

Several months later, on May 21, 2018, Claimant presented to her primary care physician and complained of occasional anxiety. (*Id.* at 692.) Her physician noted no abnormal psychiatric findings. (*Id.* at 696.) He instructed her to continue her prescribed treatment. (*Id.* at 697.) At her next appointment on July 2, 2018, Claimant reported that "she is doing fairly well" and had "no major complaints." (*Id.* at 702.) Her physician did not note any abnormal psychiatric findings and described her anxiety as "stable." (*Id.* at

706–07.)  The same was true for her appointments on July 31 and August 28, 2018.  (*Id.* at 716–17, 726–27.)

    In the meantime, on August 15, 2018, Claimant again presented to the mental health facility and requested Suboxone to treat her abuse of pain medications.  (*Id.* at 558.)  She also reported depression, manic episodes, and anxiety.  (*Id.* at 558–59.)  A mental status examination was normal aside from a disheveled appearance, anxious mood, and distractible attention and concentration.  (*Id.* at 564–65.)  She was directed to submit to a urine drug screen and to attend group therapy.  (*Id.* at 564.)  Claimant attended one group therapy session on August 22, 2018, but she did not return for further treatment and was eventually discharged on January 7, 2019. (*Id.* at 566.)

    Claimant did not report any mental health issues to her primary care provider at her November 29, 2018 appointment, and he did not note any abnormal psychiatric findings.  (*Id.* at 752, 756.)  He described her anxiety as "stable."  (*Id.* at 756.)  At her next appointment on December 27, 2018, Claimant told her physician that she was "doing well" but "still has some issues with anxiety."  (*Id.* at 762.)  A psychiatric examination was normal, and her physician stated that her anxiety was "stable."  (*Id.* at 766.)  He directed her to continue her medication.  (*Id.*)

    *4. Consultative Psychological Examinations: William C. Steinhoff, Jr., M.A.*

    On July 20, 2016, Claimant presented to a consultative psychological examination with licensed psychologist William C. Steinhoff, Jr., M.A. ("Mr. Steinhoff").  (*Id.* at 316.)  Mr. Steinhoff observed that Claimant arrived promptly to the evaluation and "was adequately groomed" and appropriately dressed but "appeared anxious and restless, shaking her leg throughout the evaluation."  (*Id.*)  Claimant told Mr. Steinhoff that she suffers from "upper and lower back pain as well as [attention-deficit hyperactivity

disorder].'' (*Id.*) She reported poor sleep, a depressed mood, crying spells, tiredness, and restlessness. (*Id.* at 317.) She also told Mr. Steinhoff that she had previously received mental health treatment "but discontinued three to four years ago." (*Id.*)

Upon mental status examination, Mr. Steinhoff noted that Claimant's "Eye contact was fair, but she was very restless," that her speech was "Clear, but rapid and pressured at times," and that "She was oriented to all spheres, except date of the month." (*Id.* at 318.) He observed that her thought process was "Circumstantial" and noted that her thought content "appeared anxious and [she] complained of pain." (*Id.*) He rated her insight as fair and described her judgment as follows: "When asked what she would do if she found an envelope in the street that was sealed, addressed and had a new stamp? [sic] She replied that she would 'leave it there.' When asked why many foods need to be cooked? [sic] She replied 'because you need to kill the germs, so you don't get sick.' She also added, 'I don't know why else.'" (*Id.*) Mr. Steinhoff noted that Claimant was able to "recall three of four items, immediately after presented" and "could recall one of the four items, after a five minute time lapse," and that "She could recall her own date of birth as well as the current and most recent past president of the United States." (*Id.*) When rating her concentration, Mr. Steinhoff stated that Claimant "could not perform serial sevens" and "had two errors" when performing serial threes" and that "She could recall up to five digits forward and three digits backward for Digit Span." (*Id.*) He described her verbal abstract reasoning as follows: "She reported that an orange and banana are alike because they are round. A boat and automobile are alike because 'I don't know.'" (*Id.*) When assessing Claimant's general fund of knowledge, Mr. Steinhoff noted that she knew "that a thermometer is used to []take your temperature and that there are sixty seconds in a minute," but "She could not recall the direction of the sunrise or how many

10

weeks are in a year." (*Id.*)  He observed that her psychomotor behavior was "Very restless." (*Id.*)  He rated her pace as "Mildly slow," her persistence as "Moderately impaired," and her social functioning as "Moderately impaired." (*Id.*)

Mr. Steinhoff diagnosed Claimant with "Major Depressive Disorder, recurrent, moderate" due to her reported sleep disturbance, crying spells, depressed mood, fatigue, and restlessness and "Unspecified Anxiety Disorder" due to her "anxious and restless" behavior, "rapid and pressured" speech, depressed mood, restricted affect, and impairments in memory, general fund of knowledge, and verbal abstract reasoning during the examination. (*Id.* at 319.)  He gave her a "Poor to guarded" prognosis." (*Id.*)

On June 12, 2017, Mr. Steinhoff conducted a second consultative psychological examination of Claimant. (*Id.* at 540.)  He again observed that she arrived on time at the evaluation and was "adequately groomed" and appropriately dressed, but he noted that she walked slowly and "appeared anxious and restless, shaking her leg during the evaluation." (*Id.*)  Claimant reported poor sleep, depressed mood, crying spells, past physical and sexual abuse, anger, nightmares, and "recurrent distressful memories." (*Id.* at 541.)  She told Mr. Steinhoff that she "currently receives [mental health] treatment" and saw a therapist once a month and a doctor every other month. (*Id.*)

Upon mental status examination, Mr. Steinhoff again noted that Claimant's "Eye contact was fair, but she was very restless," that her speech was "Clear, but rapid and pressured at times," and that "She was oriented to all spheres, except date of the month." (*Id.* at 542.)  He observed that her thought process was "Circumstantial" and noted that her thought content "appeared anxious." (*Id.*)  He rated her insight as "Limited to fair" and described her judgment as follows: "When asked what she would do if she found an envelope in the street that was sealed, addressed and had an [sic] new stamp? [sic] She

11

replied that she would 'leave it lay there.' When asked why many foods need to be cooked? [sic] She replied 'because you need to kill the germs, so you don't get sick.' She also added 'you can heat it up.'" (*Id.*) Mr. Steinhoff again noted that Claimant was able to "recall three of four items, immediately after presented" and "could recall one of the four items, after a five minute time lapse," and that "She could recall her own date of birth as well as the current and most recent past president of the United States of America." (*Id.*) When rating her concentration, Mr. Steinhoff again stated that Claimant "could not perform serial sevens" and "had two errors" when performing serial threes" and that "She could recall up to five digits forward and three digits backward for Digit Span." (*Id.*) He described her verbal abstract reasoning as follows: "She reported that an orange and banana are alike because they are round. A boat and automobile are alike because 'I don't know.'" (*Id.*) When assessing Claimant's general fund of knowledge, Mr. Steinhoff again noted that she knew "that a thermometer is used to []take your temperature and that there are sixty seconds in a minute," but "She could not recall the direction of the sunrise or how many weeks are in a year." (*Id.*) He observed that her psychomotor behavior was "Restless." (*Id.*) He rated her pace as "Mildly slow," her persistence as "Moderately impaired," and her social functioning as "Moderately impaired." (*Id.* at 542–43.)

Mr. Steinhoff diagnosed Claimant with "Major Depressive Disorder, recurrent, moderate" and "Posttraumatic Stress Disorder, chronic" based on her reports of sleep disturbance, crying spells, depressed mood, fatigue, restlessness, "recurrent distressful memories," nightmares, and "anxiety related to past sexual and physical abuse" and her "anxious and restless" behavior, "rapid and pressured" speech, depressed mood, restricted affect, and impairments in memory, general fund of knowledge, and verbal

abstract reasoning during the examination. (*Id.* at 543.) He gave her a guarded prognosis. (*Id.*)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or

13

combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the

14

claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."  20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment."  *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities."  *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five."  *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At this

point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert [("VE")] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ determined that Claimant had not engaged in substantial gainful activity since the date she filed her SSI application. (Tr. at 14.) He found that Claimant's depressive disorder/bipolar disorder, anxiety disorder, and opioid use disorder constituted "severe" impairments. (*Id.* at 14–16.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 16–17.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform medium work" and "is able to lift and/or carry 50 pounds occasionally and 25 pounds frequently." (*Id.* at 17.) He found that "She is limited to understanding, remembering, and carrying out simple instructions and simple, routine, and repetitive tasks" and that her "work should be low stress, defined as having no more than occasional decision-making required, no more than occasional changes in the work setting, and the work should not be production rate or pace work." (*Id.*) In addition, the ALJ found that Claimant "should have no more than occasional contact with the public, coworkers, and supervisors." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work.  (*Id.* at 22.)  He noted that Claimant is "a younger individual" with "a limited education" and that "[t]ransferability of job skills [was] not material to the determination of disability."  (*Id.*)  Because the ALJ determined that Claimant was unable to perform the full range of medium work, he enlisted a VE to aid in his finding that Claimant is capable of working as a kitchen helper, hospital cleaner, or groundskeeper.  (*Id.* at 22–23.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . since January 5, 2017, the date the [SSI] application was filed."  (*Id.* at 23.)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations."  *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]."  *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled,"

17

this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant argues that the ALJ erred by concluding that her neck and back impairments are not severe and that her mental impairments were not disabling.  (ECF No. 14 at 5–6.)  She further asserts that the "cumulative effect" of her physical and mental impairments renders her disabled according to the VE's hearing testimony.  (*Id.* at 6.) Claimant asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter for a rehearing.  (*Id.* at 7.)   The Commissioner responds that the ALJ appropriately performed the RFC assessment, which accounted for the impairments he determined to be non-severe.  (ECF No. 15 at 10–14.)  He also argues that the ALJ properly considered Claimant's subjective complaints and disregarded the VE's testimony that did not align with Claimant's credibly established functional limitations.  (*Id.* at 14–18.)

### A. *Severity of Neck and Back Impairments*

Claimant contends, based upon the findings of the consultative medical examiner, Dr. Roberson, that the ALJ should have found her neck and back impairments to be severe.  (ECF No. 14 at 5–6.)  An impairment is considered severe if, on its own or in combination with other impairments, it "significantly limits [the claimant's] physical or mental ability to do basic work activities" and is expected to do so "for a continuous period of at least 12 months."   20 C.F.R. §§ 404.1520(b)(4)(ii), (c), 416.920(b)(4)(ii), (c); *id.* §§ 404.1509, 416.909.  Stated another way, an impairment is sufficiently severe if it has "more than a minimal effect on the person's physical or mental ability to perform basic

work activities." *Killian v. Colvin*, No. 8:12-cv-921-MGL, 2013 WL 4853879, at *10 (D.S.C. Sept. 10, 2013) (report and recommendation of magistrate judge).

In this case, the ALJ determined that Claimant's "back and neck pain do not appear to cause more than minimal functional limitations." (Tr. at 15.) Interestingly, Claimant states that the ALJ "fail[ed] to consider" Dr. Roberson's findings of tenderness, pain with range of motion, and decreased sensation in her spine and right upper extremity (ECF No. 14 at 5), but the ALJ expressly mentioned each of these findings in his analysis (Tr. at 14–15). He contrasted them with Dr. Roberson's other findings that Claimant "had a normal gait, no difficulty heel or toe walking, and no difficulty squatting" and full range of motion in her upper extremities and spine and "a normal lower extremity examination." (Tr. at 15.) He noted that "X-ray imaging of her lumbar spine showed no evidence of acute or chronic changes" and that she never "had any formal treatment for her back symptoms." (*Id.*) The ALJ also pointed to Dr. Roberson's conclusion that the "clinical evaluation of [Claimant's] neck and back [was not] consistent with any objective findings that suggest any significant impairment." (*Id.*) He suggested that Dr. Roberson's findings were consistent with Claimant's treatment records, which "have indicated a normal gait, no back tenderness, full extremity strength, normal reflexes, and showed little to no abnormal findings regarding [Claimant's neck and back impairments]" and reflected that she "reported no trouble walking and no weakness at several [appointments]." (*Id.*) When the medical evidence of record indicates that "the condition ha[s] no more than a minimal effect on [the claimant's] ability to do basic work activities" and related testing and examination findings are normal, substantial evidence supports the ALJ's conclusion that the condition is not severe. *Stigall v. Colvin*, No. 3:14-cv-666, 2015 WL 5836002, at *14 (E.D. Va. Sept. 30, 2015) (report and recommendation of

magistrate judge).  Therefore, the undersigned **FINDS** that the ALJ properly determined that Claimant's neck and back impairments are not severe.

To the extent Claimant argues that the ALJ was obligated to adopt her hearing testimony about the severity of her neck and back impairments, that is plainly not correct. (ECF No. 14 at 5.)  "[T]he ALJ is not required to accept a claimant's testimony at face value, but rather is to weigh such testimony with all of the evidence."  *Plummer v. Astrue*, No. 5:11-cv-00006-RLV-DSC, 2012 WL 1858844, at \*3 (W.D.N.C. May 22, 2012); *see Squires v. Colvin*, No. 1:16-cv-190, 2017 WL 354271, at \*5 (M.D.N.C. Jan. 24, 2017) (report and recommendation of magistrate judge) ("[T]he ALJ labors under no obligation to accept Plaintiff's subjective complaints 'at face value.'").  As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments."  *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at \*5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)).  To evaluate the disabling effect of an individual's symptoms, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed."  *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  An individual's subjective complaints about her symptoms are relevant to the latter determination.  *See id.* §§ 404.1529(c)(3), 416.929(c)(3).

Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be

expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson*, 434 F.3d at 657 (quoting *Craig*, 76 F.3d at 591). The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018). He did so here and found that they were not. At the beginning of the RFC assessment, the ALJ recalled Claimant's hearing testimony "that she has constant back pain and that she has difficulty walking a block, sitting for long, and difficulty lifting her grandbaby." (Tr. at 18.) He also recounted Claimant's statements that "she has constant pain that is worse with walking, sitting too long, and standing" and is not relieved by medication. (*Id.*) The ALJ went on to explain that even though Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [t]he medical evidence is only partially consistent with the extent of [her] subjective allegations." (*Id.*) With regard to Claimant's "neck and back pain," the ALJ pointed to the same evidence—*i.e.*, largely normal objective physical findings and the absence of functional limitations despite pain and tenderness—he cited when explaining that Claimant's neck and back impairments were not severe. (*Id.* at 18–19.) He summarized, "There is . . . little mention of the claimant complaining of back pain in her primary care records nor more than limited treatment for her physical complaints. Furthermore, she has had generally unremarkable physical examinations. This is inconsistent to her testimony that she is in constant pain, cannot walk a block, and has difficulty lifting her grandchild." (*Id.* at 20 (internal citation omitted).) Ultimately, the ALJ limited Claimant to a reduced range of medium work to "account[] for" the "effect that [her] back and neck pain, in combination with each other or with any of her other impairments, have on [her] functioning." (*Id.* at 19.) The

undersigned **FINDS** that the ALJ's evaluation of Claimant's subjective complaints about her neck and back impairments comports with the law.

Moreover, even if the ALJ erred by concluding that Claimant's neck and back impairments are not severe, "the ALJ is required to consider all of a claimant's impairments, whether severe or non-severe, when determining [her] RFC." *Perry v. Colvin*, No. 2:15-cv-01145, 2016 WL 1183155, at *5 (S.D.W. Va. Mar. 28, 2016) (citing 20 C.F.R. §§ 404.1523, 404.1545(e)).  In other words, "the limiting effect of an impairment must be considered as part of an individual's RFC whether or not that impairment is classified as 'severe' at step two of the sequential evaluation."  *Id.* (citing 20 C.F.R. § 404.1545(e)).  The ALJ in this case explained that he considered Claimant's impairments he found to be not severe in his RFC assessment and "limited [her] to a range of medium work to account for any physical limitations caused by the combination of [her] physical impairments." (Tr. at 15.)  As part of his RFC assessment, he elaborated on why the evidence related to Claimant's neck and back impairments warranted the limitation.  (*Id.* at 18–19.)  "[F]ailing to list a severe impairment at the second step of the [sequential evaluation] process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps."  *Fisher v. Saul*, No. 2:19-cv-00032, 2019 WL 4696147, at *10 (S.D.W. Va. Aug. 20, 2019), *adopted by* 2019 WL 4691518 (S.D.W. Va. Sept. 25, 2019).  Because he did so here, the undersigned **FINDS** that remand is not warranted even assuming there was error.

### B.  Mental Impairments

Claimant also argues that the ALJ incorrectly evaluated her mental impairments. (ECF No. 14 at 5–6.)  She appears to take issue with the ALJ's conclusion that those

mental impairments fail to meet or medically equal Listings 12.04 and 12.06, as she references those pages of the ALJ's written decision in her brief.  (*Id.*)  At step three of the sequential evaluation process, the ALJ is tasked with determining whether the claimant's physical and mental impairments, either singularly or in combination, meet or medically equal a Listing.  *Shinaberry v. Saul*, 952 F.3d 113, 118–19 (4th Cir. 2020) (quoting *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015)).  The Listings for mental disorders—with the exception of Listing 12.05 for intellectual disorders, which is not relevant in this case—require the claimant to "(1) have an impairment that satisfies the description of the particular disorder contained in the introductory paragraph; (2) document the presence of the disorder through medical findings (paragraph A criteria); and (3) substantiate impairment-related functional limitations that are incompatible with the ability to do any gainful activity (paragraph B or paragraph C criteria)."  *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *10 (S.D.W. Va. June 17, 2011); *see* 20 C.F.R. pt. 404, subpt. P, appx. 1, § 12.00A2.

When evaluating the "Paragraph B" criteria, the ALJ "rate[s] the degree of [the claimant's] functional limitation based on the extent to which [his] impairment(s) interfere[] with [his] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 416.920a(c)(2).  To do so, the ALJ considers four functional areas—understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting or managing oneself—and specifies whether the claimant's limitations are none, mild, moderate, marked, or extreme.  *Id.* § 416.920a(c)(4).  A claimant's mental disorder satisfies the "Paragraph B" criteria if it "result[s] in extreme limitation of one, or marked limitation of two," of the four areas of mental functioning.  *Id.* pt. 404, subpt. P, appx. 1, § 12.00F2.

Here, the ALJ found that Claimant has moderate limitations in each of the four functional areas. (Tr. at 16–17.) When addressing Claimant's ability to understand, remember, and apply information, he noted her subjective statements about "difficulties with her memory, understanding, and following instructions" and the findings of Mr. Steinhoff, the consultative psychological examiner, that Claimant "recalled three out of four objects immediately and only one out of four objects after five minutes" but contrasted them with the "intact memory noted in some of her treatment records." (*Id.* at 16.) As to her ability to interact with others, the ALJ pointed to Claimant's subjective statements that "she does not leave her house often" and has "problems getting along with others," as well as Mr. Steinhoff's findings that Claimant "was restless" and had "moderately impaired social functioning." (*Id.*) When addressing Claimant's ability to concentrate, persist, and maintain pace, the ALJ noted Claimant's subjective statements about "difficulties concentrating and completing tasks" and Mr. Steinhoff's findings that she "had a mildly slow pace, moderately impaired persistence, and some concentration difficulties" but contrasted them with the "intact concentration in some of her treatment records." (*Id.*) And as to Claimant's ability to adapt and manage herself, the ALJ contrasted her subjective statements "that she does not handle stress or changes in routine well" and Mr. Steinhoff's findings of "limited to fair insight" with her subjective statements "that she could perform personal care activities and that she could go out alone" and the "good judgment" findings "in some of her mental health treatment records." (*Id.* at 17.) In other words, the ALJ acknowledged that Claimant's mental impairments caused functional limitations but did not determine those limitations to be "marked" or "extreme." The undersigned **FINDS** that the ALJ's "Paragraph B" findings

are supported by substantial evidence; therefore, he did not err by determining that Claimant's mental impairments do not satisfy Listings 12.04 and 12.06.

As with her physical impairments, Claimant again suggests that the ALJ should have accepted her subjective complaints about her mental limitations. (ECF No. 14 at 6.) The ALJ concluded that "the medical evidence is . . . only partially consistent with the extent of [Claimant's] subjective allegations" about her mental impairments. (Tr. at 19.) In his review of the medical evidence of record, the ALJ acknowledged the diagnoses and prognosis given by Mr. Steinhoff (*id.* at 19–20), which Claimant references in her brief (ECF No. 14 at 5–6). However, he explained that he discounted Claimant's subjective complaints because she "has had inconsistent mental health treatment and she has been discharged multiple times after not responding to follow up attempts" and because "when [she] has received mental health treatment, there have been some abnormalities noted upon examination, but she also had indicated improvement with medication." (Tr. at 20.) Evidence that the claimant failed to follow up with treatment and that her impairments are controlled with medication are permissible reasons to reject the claimant's subjective complaints about the extent of her symptoms. *See Dunn v. Colvin*, 607 F. App'x 264, 274–76 (4th Cir. 2015). As such, the undersigned **FINDS** that the ALJ's evaluation of Claimant's subjective complaints about her mental impairments is supported by substantial evidence.

Claimant also seems to challenge the ALJ's RFC assessment as it relates to her mental impairments. (ECF No. 14 at 6.) However, the ALJ plainly accounted for Claimant's mental impairments in the RFC assessment, limiting her to simple instructions and tasks, low-stress work, and only occasional contact with others. (Tr. at 17.) In doing so, he gave "substantial weight" the opinions of the state-agency

psychological consultant at the reconsideration level that Claimant "could understand, remember, and carry out one-to-three step commands; sustain tasks within a reasonable schedule that allows brief periods of disruption related to her symptoms; could sustain tasks that entail only occasional and superficial interactions with others; and could respond appropriately to usual work situations and deal with changes in a routine work setting." (*Id.* at 20.)  He explained that the state-agency psychological consultant had the benefit of Claimant's June 2017 consultative psychological examination and other mental health treatment records when conducting her assessment and that her opinions were consistent with the record evidence.  (*Id.*)  Notably, Claimant does not challenge the ALJ's treatment of those opinions.  (ECF No. 14.)  As such, the undersigned **FINDS** that the RFC assessment as it relates to Claimant's mental impairments is supported by substantial evidence.

### C. VE Testimony

Lastly, Claimant argues that the ALJ "should have accepted" the VE's testimony that an individual who "is off-task more than 10% of the normal workday or misses two (2) or more days per month or requires job task reminders 4-6 times during the normal workday" due to her conditions is unable to work.  (ECF No. 14 at 6.)  She contends that her "physical and mental impairments would preclude her from staying on task sufficiently during the workday or getting to work in the first place."  (*Id.*)  She does not elaborate why that is so.  (*Id.*)

The ALJ's hypothetical questions to the VE "need only incorporate those limitations which are credibly established in the record."  *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006)

("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)). The ALJ may present alternative hypotheticals to the VE, "even if they are contradictory," and may "determine after the hearing which hypothetical is supported by the record evidence." *Hart v. Berryhill*, No. 5:18-cv-208-D, 2019 WL 1759741, at *6 (E.D.N.C. Mar. 26, 2019) (quoting *Woodlief*, 2017 WL 9478528, at *5); *see Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (per curiam) (table), 1998 WL 559728, at *2 (stating that hypothetical questions that alternatively included claimant's subjective complaints and did not include them "were entirely proper" because hypothetical not equivalent to "findings of fact"). To that end, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." *Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)).

As explained above, the ALJ's RFC assessment demonstrates that he ultimately concluded that the hypothetical questions to which Claimant refers were not supported by the record evidence. (Tr. at 21–22.) The undersigned therefore **FINDS** that the ALJ had no obligation to adopt them.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: February 10, 2021

Dwane L. Tinsley
United States Magistrate Judge

28